**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHANGING THE WORLD FILMS, LLC, SELTON SHAW, and LANGSTON SHAW, <br><br> *Plaintiffs*, <br><br> v. <br><br> NATHANIEL PARKER *a/k/a* NATE PARKER, TM FILM FINANCE, LLC *d/b/a* TM FILMS, TINY GIANT PRODUCTIONS, LLC *d/b/a* TINY GIANT ENTERTAINMENT, VERTICAL ENTERTAINMENT, LLC, SHELTON JACKSON LEE *a/k/a* SPIKE LEE, and ASP FILM, LLC, <br><br> *Defendants*. | Case No. 1:21-cv-2787-DLF |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOVING
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Alison Schary (Bar No. 1014050)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500
Washington, DC  20005
Tel: (202) 973-4248
alisonschary@dwt.com

Nicolas A. Jampol (*pro hac vice*)
Cydney Swofford Freeman (*pro hac vice*)
Samantha Lachman (*pro hac vice*)
Davis Wright Tremaine LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, CA 90017
Tel: (213) 633-8651
nicolasjampol@dwt.com
cydneyfreeman@dwt.com
samlachman@dwt.com

*Counsel for Nathaniel Parker, Tiny Giant
Productions, LLC, ASP Film, LLC, TM Film
Finance, LLC, and Vertical Entertainment, LLC*

## <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ........................................................................................................ 1

II.  FACTUAL BACKGROUND ..................................................................................... 2

   A.   Plaintiffs and *A Routine Stop* ......................................................................... 2

   B.   Defendants and *American Skin* ...................................................................... 3

   C.   This Lawsuit ..................................................................................................... 6

III.   MOVING DEFENDANTS' ALLEGED CONTACTS WITH THE DISTRICT OF COLUMBIA ARE INSUFFICIENT TO ESTABLISH PERSONAL JURISDICTION ............... 6

   A.   Plaintiffs Cannot Establish General Jurisdiction Over the Moving Defendants ................. 7

   B.   Plaintiffs Cannot Establish Specific Jurisdiction Over the Moving Defendants ................ 8

      1.   The D.C. Long-Arm Statute Does Not Authorize Jurisdiction Over the Moving Defendants ..................................................................................... 9

      2.   Exercise of Personal Jurisdiction Over the Moving Defendants Would Violate Due Process ........................................................................................ 12

IV.   PLAINTIFFS FAIL TO STATE A CLAIM AS A MATTER OF LAW ............................. 15

   A.   Plaintiffs Fail to Adequately Plead Access ...................................................... 16

   B.   *A Routine Stop* and *American Skin* Are Not Substantially Similar .................... 18

      1.   Substantial Similarity May Be Decided on a Motion to Dismiss ................. 19

      2.   Courts Must Set Aside Unprotectable Elements .......................................... 21

      3.   The Works' Protectable Expression Is Not Substantially Similar ............... 23

   C.   Plaintiffs' Contributory and Vicarious Infringement Claims Likewise Fail ................... 34

V.   CONCLUSION ........................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abdin v. CBS Broad.*,
   971 F. 3d 57 ....................................................................................................19, 23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).........................................................................................16

*Benay v. Warner Bros.*,
   607 F.3d 620 (9th Cir. 2010) .............................................................22, 23, 25

*Bigelow v. Garrett*,
   299 F. Supp. 3d 34 (D.D.C. 2018) ..............................................................6, 7, 8, 9

*Briggs v. Blomkamp*,
   70 F. Supp. 3d 1155 (N.D. Cal. 2014) ........................................................17

*Brighter Sky Productions v. Marriott Int'l*,
   2018 WL 2248601 (S.D. W.Va. May 16, 2018)................................................15

*Buchanan v. Sony Music Ent.*,
   2020 WL 2735592 (D.D.C. May 26, 2020)........................................16, 17, 18, 19

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985).........................................................................................12

*Crane v. Carr*,
   814 F.2d 758 (D.C. Cir. 1987) .......................................................................11

*Erickson v. Blake*,
   2011 WL 3497798 (D. Neb. Aug. 10, 2011) .................................................14

*Feist Publ'ns v. Rural Tel. Serv.*,
   499 U.S. 340 (1991).........................................................................................15

*Fillmore v. Blumhouse Prods.*,
   2017 WL 4708018 (C.D. Cal. July 7, 2017)..................................................22

*Gaines v. District of Columbia*,
   961 F. Supp. 2d 218 (D.D.C. 2013)................................................15, 18, 19, 21

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011)..........................................................................................7

*Green v. Harbach*,
   2018 WL 3350329 (S.D.N.Y. July 9, 2018) ..........................................................19

*\*GTE New Media Servs. Inc. v. BellSouth Corp.*,
   199 F.3d 1343 (D.C. Cir. 2000) ...................................................6, 12, 13, 14

*Hallford v. Fox Entm't Grp., Inc.*,
   2013 WL 541370 (S.D.N.Y. Feb. 13, 2013) .........................................................19

*\*Hayes v. FM Broad. Station WETT (FM)*,
   930 F. Supp. 2d 145 (D.D.C. 2013) .............................................................14, 15

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408 (1984) ..............................................................................12

*Helmer v. Doletskaya*,
   393 F.3d 201 (D.C. Cir. 2004) ....................................................................10

*Heusey v. Emmerich*,
   2015 WL 12765115 (C.D. Cal. Apr. 9, 2015) .......................................................19

*Hoehling v. Universal City Studios, Inc.*,
   618 F.2d 972 (2d Cir. 1980) .....................................................................21

*Howe v. Embassy of Italy*,
   68 F. Supp. 3d 26 (D.D.C. 2014) ..................................................................6

*IMAPizza, LLC v. At Pizza Ltd.*,
   334 F. Supp. 3d 95 (D.D.C. 2018) .................................................................9

*Jackson v. Michalski*,
   2011 WL 3679143 (W.D. Va. Aug. 22, 2011) .......................................................14

*Jones v. Blige*,
   558 F.3d 485, 491 (6th Cir. 2009) ...............................................................16

*Jones v. CBS*,
   733 F. Supp. 748 (S.D.N.Y. 1990) ................................................................34

*Jorgensen v. Epic/Sony Records*,
   351 F.3d 46 (2d Cir. 2003) ......................................................................16

*Jung v. Ass'n of Am. Med. Colls.*,
   300 F. Supp. 2d 119 (D.D.C. 2004) ................................................................6

*Lane v. Knowles-Carter*,
   2015 WL 6395940 (S.D.N.Y. Oct. 21, 2015) ........................................................19

*McFarlane v. Esquire Mag.*,
  74 F.3d 1296 (D.C. Cir. 1996) ........................................................................10

*McKain v. Estate of Rhymer*,
  166 F. Supp. 3d 197 (D. Conn. 2015) ............................................................18

*Morningstar Films, LLC v. Nasso*,
  2021 WL 4076979 (E.D.N.Y. Aug. 15, 2021) ...............................................14

*Nat'l Shopmen Pension Fund v. Disa*,
  583 F. Supp. 2d 95 (D.D.C. 2008) .................................................................20

*Nat'l Women's Pol. Caucus v. Metro. Louisville Women's Political Caucus*,
  359 F. Supp. 3d 13 (D.D.C. 2019) ...................................................................8

*NAWA USA, Inc. v. Bottler*,
  533 F. Supp. 2d 52 (D.D.C. 2008) .................................................................10

*Nelson v. Grisham*,
  942 F. Supp. 649 (D.D.C. 1996) .............................................................20, 21

*Newborn v. Yahoo!*,
  391 F. Supp. 2d 181 (D.D.C. 2005) ...............................................................35

*Nobile v. Watts*,
  747 F. App'x 879 (2d Cir. 2018) .............................................................22, 25

*One Media IP Ltd. v. S.A.A.R. SrL*,
  122 F. Supp. 3d 705 (M.D. Tenn. 2015) ........................................................14

*Peter F. Gaito Architecture v. Simone Dev. Corp.*,
  602 F. 3d 57 (2d Cir. 2010) ......................................................................19, 20

*Polsby v. St. Martin's Press, Inc.*,
  8 F. App'x 90 (2d Cir. 2001) .........................................................................20

*Reyher v. Children's Television Workshop*,
  533 F.2d 87 (2d Cir. 1976) .......................................................................23, 34

*Schkeiban v. Cameron*,
  2012 WL 12895721 (C.D. Cal. July 20, 2012) ..............................................17

*Scott-Blanton v. Universal City Studios Prods.*,
  539 F. Supp. 2d 191 (D.D.C. 2008) ...............................................................21

*Second Amendment Found. v. U.S. Conf. of Mayors*,
  274 F.3d 521 (D.C. Cir. 2001) ...................................................................6, 24

*Shaheen v. Smith,*
   994 F. Supp. 2d 77 (D.D.C. 2013) ..............................................................10, 11

Sheldon Abend Revocable Tr. v. Spielberg,
   748 F. Supp. 2d 200 (S.D.N.Y. 2010).........................................................23, 25

Shull v. TBTF Productions,
   2021 WL 3027181 (2d Cir. July 19, 2021) .......................................................19

Silas v. Home Box Office,
   201 F. Supp. 3d 1158 (C.D. Cal. 2016) ............................................................28

Starkey v. Minor Miracle Prods., LLC,
   43 F. Supp. 3d 22 (D.D.C. 2014).........................................................................8

Tanksley v. Daniels,
   902 F.3d 165 (3d Cir. 2018)........................................................................19, 29

Triple Up Ltd. v. Youku Tudou Inc.,
   235 F. Supp. 3d 15 (D.D.C. 2017) ....................................................................13

Wager v. Littell,
   2013 WL 1234951 (S.D.N.Y. Mar. 26, 2013) ..................................................16

Walden v. Fiore,
   571 U.S. 277 (2014)..........................................................................................13

*Walker v. Time Life Films,*
   784 F.2d 44 (2d Cir. 1986).........................................................................20, 22

*Whitehead v. CBS/Viacom,*
   315 F. Supp. 2d 1 (D.D.C. 2004) ................................................................22, 24

*Whitehead v. Paramount Pictures,*
   53 F. Supp. 2d 38 (D.D.C. 1999) ..........................................................21, 29, 30

Wild v. NBC Universal,
   788 F. Supp. 2d 1083 (C.D. Cal. 2011) ............................................................19

Williams v. A & E Television Networks,
   122 F. Supp. 3d 157 (S.D.N.Y. 2015).............................................................35

*Williams v. Crichton,*
   84 F. 3d 581 (2d Cir. 1996)........................................................................21, 23

Williams v. Romarm, SA,
   756 F.3d 777 (D.C. Cir. 2014) .........................................................................12

*Xie v. Sklover & Co., LLC*,
    260 F. Supp. 3d 30 (D.D.C. 2017) ...........................................................................8

*Zaletel v. Prisma Labs, Inc.*,
    226 F. Supp. 3d 599 (E.D. Va. 2016) ....................................................................14

**State Statutes**

D.C. Code § 13-334(a) ...................................................................................................7

D.C. Code § 13-422 .......................................................................................................7

D.C. Code § 13-423 .............................................................................................. *passim*

**Rules**

Fed. R. Civ. P. 12(b)(2).............................................................................................1, 6

Fed. R. Civ. P. 12(b)(6)....................................................................................1, 19, 22

Defendants Nathaniel Parker, Tiny Giant Productions, LLC, ASP Film, LLC, TM Film Finance LLC, and Vertical Entertainment, LLC (collectively, the "Moving Defendants") respectfully submit this memorandum of points and authorities in support of their motion to dismiss the complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) and for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).

## I.     INTRODUCTION

Plaintiffs Changing the World Films, LLC, Selton Shaw, and Langston Shaw assert copyright infringement claims against numerous out-of-state defendants relating to alleged conduct that has no specific connection to the District of Columbia – namely, the development, production, and distribution of the award-winning film *American Skin*.  The Moving Defendants have no relevant connections to the forum, and none of the allegedly infringing conduct has taken place in the forum.  As a result, this Court lacks personal jurisdiction over the Moving Defendants, and this case should be dismissed for this reason alone.

Apart from jurisdictional deficiencies, Plaintiffs' allegations of access and substantial similarity – both of which are required to state a valid copyright claim – are severely lacking. Plaintiffs allege that the Moving Defendants had access to Plaintiffs' screenplay entitled *A Routine Stop* because Plaintiffs submitted their screenplay to the American Black Film Festival's screenwriting competition.  Plaintiffs fail to allege, however, any factual connection whatsoever between the competition and the Moving Defendants.  Instead, Plaintiffs speculate that two of the defendants (Nathaniel Parker and Spike Lee) and an *American Skin* actor (Omari Hardwick) *must have* been involved with the competition because they are "prominent, influential, and successful members of the African American film and television community."  Compl. ¶ 74(a). Plaintiffs compound this deficiency with conclusory allegations in the alternative that some unidentified individual connected to the competition must have provided the Moving Defendants

with Plaintiffs' screenplay or the Moving Defendants must have "obtained a copy of Plaintiffs' screenplay through another channel." *Id.* ¶ 74(b)-(c). These alternative theories, unsupported by any factual allegations, are not remotely sufficient to show access.

In addition to Plaintiffs' failure to adequately allege access, they also cannot show substantial similarity as a matter of law. Plaintiffs attempt to claim ownership over an unprotectable idea – namely, the portrayal of an African American man who takes matters into his own hands when the justice system fails to hold law enforcement accountable for the murder of a family member. Courts across the country routinely dismiss copyright infringement actions like this case, which rely on alleged similarities that are nothing more than unprotectable ideas and generic elements that are commonplace in film and television. *American Skin* and *A Routine Stop* certainly share unprotectable similarities, but they are significantly different in their *protectable elements*, which is all that matters under copyright law.

Because this Court lacks personal jurisdiction over the Moving Defendants, and Plaintiffs failed to adequately allege access or substantial similarity, the Moving Defendants respectfully request that this Court dismiss Plaintiffs' claims against them with prejudice.

## II.     FACTUAL BACKGROUND

### A.     Plaintiffs and *A Routine Stop*

Plaintiffs Selton and Langston Shaw are screenwriters who "write, produce, and direct films together through their entertainment company, Changing the World Films, LLC," which they own and operate. Compl. ¶¶ 2, 7. Selton Shaw resides in Maryland, and Langston Shaw resides in the District of Columbia. *Id.* ¶¶ 8-9.

Plaintiffs allege that in 2017, they wrote a screenplay called *A Routine Stop*, "which focused on police violence against Black men and women and the country's systemic indifference to it." Compl. ¶ 2. In *A Routine Stop*, twin brothers Romulus and Remus are

driving home from a wedding when they are stopped by police, purportedly for failing to signal during a lane change.  Compl. Ex. A at 4, 20.  Officer Kyle Tully shoots and kills Romulus.  *Id.* at 8, 40.  After a grand jury decides not to indict Tully, Remus enlists friends to help him kidnap Tully and forces the officer through a fake trial that is broadcast live from an undisclosed recording studio.  *Id.* at 5-9, 11, 12-17.  Presenting his case to who he believes are twelve hostages acting as a jury, Tully attempts to justify the shooting by claiming Romulus was "acting erratic" during the stop and "was a criminal with a rap sheet longer than a roll of toilet paper" (unlike Remus, who has no criminal record and is a college graduate).  *Id.* at 18, 24.

Seeing the twins' mother testify as a witness during the live broadcast, Tully's police colleagues track down the mother and convince her to tell them where the trial is taking place.  *Id.* at 27, 45-46, 61.  Police storm the recording studio and reveal that the twelve jury members are ten mannequins and only two real hostages – Tully's own wife and son.  *Id.* at 75-79.  An epilogue reveals that as a result of Remus's "trial," some measure of justice is obtained – specifically, Tully is indicted and fired, and the cops decide not to file charges against Remus for the kidnappings.  *Id.* at 82.  The screenplay concludes with a twist: the audience learns that Remus and Romulus swapped IDs in the car, and Tully killed Remus, not Romulus.  Romulus receives a second chance at life, without his criminal record and with Remus's name.  *Id.* at 83, 85.

Plaintiffs allege they submitted *A Routine Stop* to the 2017 TV One Screenplay Competition; the screenplay was not selected as a competition finalist.  Compl. ¶¶ 3, 36.

### B.    Defendants and *American Skin*

Plaintiffs bring suit against an array of individual and corporate defendants: Shelton Jackson Lee (professionally known as Spike Lee), Nathaniel "Nate" Parker, Tiny Giant Productions, LLC, ASP Film, LLC, TM Film Finance LLC, and Vertical Entertainment, LLC.

...

Other than Mr. Lee, who Plaintiffs allege lives in New York, all defendants – *i.e.* all Moving Defendants – reside in California.  *See* Compl. ¶¶ 11-16; Declaration of Mark Burg ("Burg Decl.") ¶ 5; Declaration of Peter Jarowey  ("Jarowey Decl.") ¶ 5; Declaration of Nathaniel Parker ("Parker Decl.") ¶¶ 3-4.

The Moving Defendants wrote, produced, and distributed the film *American Skin*, which premiered at the 2019 Venice Film Festival in Venice, Italy.  *See* Compl. ¶¶ 11-14, 16, 19. *American Skin* is presented largely as the final project of a group of film students' graduate documentary thesis.  As revealed by officer bodycam footage, a former marine turned high school janitor, Lincoln, and his 14-year-old son, Kajani, are stopped by police while driving through an affluent neighborhood in Los Angeles, allegedly for speeding.  *See* Declaration of Cydney Swofford Freeman Ex. 1 ("Ex. 1") at 1:03.[1]  Kajani, who studied constitutional rights at his private school (where his father is the janitor), insists on filming the interaction despite his father's pleas for him to put down the phone.  *Id.* at 2:05.  Police escalate the situation and an officer named Randall ultimately shoots and kills unarmed Kajani.  *Id.* at 2:35.

A year later, around the time a grand jury is about to decide whether to indict Officer Randall, a student documentary team approaches Lincoln with an idea to document the decision. *Id.* at 2:55.  Lincoln reluctantly allows the film crew access to his family, and the documentarians capture the family's dismay as the grand jury fails to indict Officer Randall.  *Id.*

---

[1] This exhibit is in DVD format and is exempted from the Court's e-filing requirement pursuant to LCvR 5.4(e)(1).  In accordance with LCvR 5.4(e)(1), copies of this DVD exhibit are being maintained in the Moving Defendants' possession, and Moving Defendants have served the DVD exhibit on all other counsel of record.  *See* Freeman Decl. ¶ 2.  The Moving Defendants will provide the Court with additional copies upon its request, pursuant to this Court's standing order.  *See* Dkt. 2 ¶ 3(d).

at 20:00.  The film crew follows the subsequent uprising throughout the city, and police ask Kajani's mother to film a statement asking protestors to abandon the violence.  *Id.* at 24:20.

Shortly after, Lincoln asks the documentary crew to give him a ride.  Unbeknownst to the students, they are forced to assist Lincoln in kidnapping the police captain.  *Id.* at 26:30.  Lincoln and a crew of several other military veterans take the police captain to the police station and lock down the premises, taking everyone inside hostage.  *Id.* at 29:00.  Seeking justice where the system failed, Lincoln stages a trial charging Randall with Kajani's murder, setting himself as the prosecutor, one of the police officers held hostage as Randall's defense counsel, and civilians, inmates, and administrative officers as the jury.  *Id.* at 39:50.  Lincoln forces the student documentarians to film and ultimately participate in the trial.  *Id.* at 35:35.

After extended discussions between the civilians, inmates, officers, and veterans about racism, the police's role in a community, patriotism, classism, and education, the jury ultimately finds Randall guilty of murder after he admits Lincoln was not speeding and that Randall racially profiled Lincoln.  *See id.* at 48:10, 51:35, 52:43, 54:30, 57:10, 1:11:53, 1:14:34.  Lincoln raises his gun to Randall's head to carry out a sentence of death, but not before allowing Randall to call his wife and son, to whom Randall apologizes and admits that he made a mistake.  *Id.* at 1:15:20.  Lincoln pulls the trigger, but has emptied the gun – revealing he had no intention of killing Randall, and instead only wanted justice for his son.  *Id.* at 1:17:20.  Lincoln and the veterans ultimately release the hostages, and Randall asks Lincoln to leave the building by his side, "not as an enemy."  *Id.* at 1:21:31.  Despite Randall yelling that Lincoln is unarmed, a sniper shoots Lincoln in the head, and police step over his lifeless body without even a pause as they sweep the building.  *Id.* at 1:22:39.  The student documentary concludes with (fictional) media clips

explaining away the takeover by claiming that Lincoln was mentally unstable and connected to Islamic extremists, and quickly pivoting to an upbeat discussion of sports.  *Id.* at 1:23:25.

### C. This Lawsuit

On October 20, 2021, Plaintiffs filed their complaint for direct, contributory, and vicarious copyright infringement.  Compl. ¶¶ 82-105.  The Moving Defendants now move to dismiss the complaint in its entirety, with prejudice.

## III. MOVING DEFENDANTS' ALLEGED CONTACTS WITH THE DISTRICT OF COLUMBIA ARE INSUFFICIENT TO ESTABLISH PERSONAL JURISDICTION

When a defendant moves to dismiss a lawsuit for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the "plaintiff bears the burden of making a *prima facie* showing that the Court has personal jurisdiction over the defendant."  *Bigelow v. Garrett*, 299 F. Supp. 3d 34, 40-41 (D.D.C. 2018).  To do so, the plaintiff "must provide sufficient factual allegations, apart from mere conclusory assertions, to support the exercise of personal jurisdiction over the defendant."  *Howe v. Embassy of Italy*, 68 F. Supp. 3d 26, 29 (D.D.C. 2014).  In other words, the plaintiff "must allege *specific acts* connecting [each] defendant with the forum."  *Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001) (emphasis added) (internal quotation marks omitted).  The court need not accept the plaintiff's "conclusory statements" or "bare allegations" regarding the defendant's actions in the forum, *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000), and "may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts," *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 127 (D.D.C. 2004) (internal quotation marks omitted).

Plaintiffs allege that this Court has both general and specific personal jurisdiction, Compl. ¶ 19, but they do not come close to showing sufficient contacts between the Moving Defendants and the District of Columbia to subject them to general or specific jurisdiction.

**A.     Plaintiffs Cannot Establish General Jurisdiction Over the Moving Defendants**

"For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).  Section 13-422 of the District of Columbia's long-arm statute authorizes general jurisdiction over "over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief."  D.C. Code § 13-422.  For a non-resident corporation, D.C. Code § 13-334(a) provides for general jurisdiction when it is "doing business in the District."  For purposes of general jurisdiction, "doing business" requires a "sufficiently extensive course of conduct" in the forum.  *Bigelow*, 299 F. Supp. 3d at 41-43 (finding no general jurisdiction over the defendants even though they had paid money to people and entities in the district, solicited and received money from forum residents, and displayed allegedly infringing photographs on websites, including YouTube).

Plaintiffs allege that this Court has general personal jurisdiction over the Moving Defendants because they "conduct systematic and continuous business in this district."  Compl. ¶ 19.  This conclusory allegation lacks any basis in fact whatsoever.  As Plaintiffs themselves allege, *none* of the Moving Defendants are domiciled in the District of Columbia or organized under the laws of the District of Columbia; nor do they maintain their principal place of business in this district.  *See* Compl. ¶¶ 11 (Parker), 12 (TM Film), 13 (Tiny Giant), 14 (Vertical) 16 (ASP Film).  Moreover, the Moving Defendants do not conduct *any* business in this district, let alone

systematic and continuous business.  *See* Burg Decl. ¶ 6; Jarowey Decl. ¶¶ 6-7; Parker Decl. ¶¶ 6, 9.  The alleged contacts between the Moving Defendants and this district – i.e., that their film was available on third-party streaming platforms – are significantly more attenuated than even in *Bigelow*, which rejected general (and specific) jurisdiction.  *Bigelow*, 299 F. Supp. 3d at 42-43; *see also Xie v. Sklover & Co., LLC*, 260 F. Supp. 3d 30, 39 (D.D.C. 2017) (no general personal jurisdiction over non-resident individuals and LLC, which had its principal place of business in New York); *Starkey v. Minor Miracle Prods., LLC*, 43 F. Supp. 3d 22, 26-27 (D.D.C. 2014) (no general personal jurisdiction over LLC, which did not conduct continuous or systematic business in the District of Columbia).

Because Plaintiffs' jurisdictional allegations are insufficient to show that the Moving Defendants were "doing business" or "at home" in the District of Columbia or that Parker is a domiciliary of or maintains his principal place of business in this district, the Moving Defendants are not subject to general jurisdiction in the District of Columbia.

### B.   Plaintiffs Cannot Establish Specific Jurisdiction Over the Moving Defendants

Whether there is personal jurisdiction over a non-resident defendant "turns, at first glance, on two questions: first, whether the D.C. long-arm statute authorizes jurisdiction, *see* D.C. Code § 13-423, and second, whether the exercise of jurisdiction comports with federal due process."  *Nat'l Women's Pol. Caucus v. Metro. Louisville Women's Political Caucus*, 359 F. Supp. 3d 13, 18 (D.D.C. 2019).

Plaintiffs assert that their allegations "arise from action and contact" by Defendants in this district, that Defendants "committed a substantial part of the acts of infringement" in this district, and that Defendants "injured Plaintiffs" in this district.  Compl. ¶ 19.  These conclusory allegations do not come close to establishing specific jurisdiction.

8

1.      **The D.C. Long-Arm Statute Does Not Authorize Jurisdiction Over the Moving Defendants**

The District of Columbia's long-arm statute allows for personal jurisdiction over claims that arise from specific enumerated scenarios, including "causing tortious injury in the District of Columbia by an act or omission in the District of Columbia" and "causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if [defendant] regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."  D.C. Code § 13-423(a).  "While the long-arm statute is interpreted broadly and factual disputes are resolved in favor of the plaintiff, the plaintiff must allege some *specific facts* evidencing *purposeful activity* by the defendants in the District of Columbia by which they invoked the benefits and protections of the laws of the District of Columbia."  *Bigelow*, 299 F. Supp. 3d at 44 (emphases added).

Plaintiffs fail to "identify which prong of the long-arm statute [they are] relying on as the basis for jurisdiction."  *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 110 (D.D.C. 2018).  Based on the complaint's allegations, the Moving Defendants assume that Plaintiffs are relying on Section 13-423(a)(3) ("causing tortious injury in the District of Columbia by an act or omission in the District of Columbia") or 13-423(a)(4) ("causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if [defendant] regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia").[2]

_____

[2] Plaintiffs do not make any factual allegations about any of the Moving Defendants transacting business in the District of Columbia, nor do they allege that any of the Moving Defendants contracted to supply services in the District of Columbia.  D.C. Code § 13-423(a)(1)-(2).  The remaining enumerated scenarios that may give rise to jurisdiction under the statute do not appear to have any relevance to this dispute.  D.C. Code § 13-423(a)(5) (possessing real

While both (a)(3) and (a)(4) involve injury in the District of Columbia, the long-arm statute makes a "careful distinction" between them: while an act *in* the District of Columbia may, by itself, give rise to personal jurisdiction, an act *outside* the District of Columbia is not immediately within the court's jurisdiction. *See McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1300 (D.C. Cir. 1996) (explaining distinction between subsections (a)(3) and (a)(4) and affirming district court's holding that personal jurisdiction did not exist over defendant under either subsection). Plaintiffs cannot establish specific jurisdiction under either (a)(3) or (a)(4).

a. **D.C. Code § 13-423(a)(3)**

There is no allegation whatsoever of any conduct by any of the Moving Defendants *in* the District of Columbia. This provision "requires that both act *and* injury occur in the District of Columbia." *Helmer v. Doletskaya*, 393 F.3d 201, 208 (D.C. Cir. 2004) (emphasis added). Plaintiffs allege that Selton Shaw works in the District of Columbia, Langston Shaw is a resident of the District of Columbia, and Plaintiffs wrote the screenplay for *A Routine Stop* primarily in the District of Columbia. Compl. ¶¶ 8-10. But those allegations by themselves do not give rise to specific jurisdiction. *NAWA USA, Inc. v. Bottler*, 533 F. Supp. 2d 52, 56 (D.D.C. 2008) ("[A] plaintiff may not rely only on his own activity within the forum to establish the existence of the defendant's minimum contacts"). Instead, Plaintiffs must also establish an *act* in this district *by each of the Moving Defendants*, which they have failed to do.[3] Because Plaintiffs have not

---

property in the District of Columbia); (a)(6) (contracting to insure or act as surety relating to the District of Columba); (a)(7) (marital or parent and child relationship in the District of Columbia). To the extent Plaintiffs allege jurisdiction under any of these other subsections, the Moving Defendants will respond to such argument on reply.

[3] To the extent Plaintiffs contend that the "act" in this district giving rise to jurisdiction is the availability of *American Skin* on a third-party platform that is available to residents, the Moving Defendants do not own or operate any such platform, and even if they did, "[m]ere access to the defendants' website from the District is insufficient to establish that the tortious 'act' occurred *in* the District." *Shaheen v. Smith*, 994 F. Supp. 2d 77, 83 (D.D.C. 2013). As

shown that any tortious act occurred in the District of Columbia, personal jurisdiction under § 13-423(a)(3) is inappropriate.

### b.       D.C. Code § 13-423(a)(4)

Any reliance on § 13-423(a)(4) also is unavailing.  Under this provision, an act outside the District of Columbia may be sufficient to establish jurisdiction, but only if the defendant "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."  D.C. Code § 13-423(a)(4).  Courts characterize this additional requirement as a "plus factor."  *See Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987).

Plaintiffs fail to establish how the Moving Defendants engage in any of those activities. Indeed, the complaint acknowledges that the Moving Defendants all are based in California and that *American Skin* premiered at the Venice Film Festival.  Compl. ¶¶ 11-14, 16, 41, 45-46. Plaintiffs submitted their screenplay to the 2017 TV One competition, but they make no allegation that the competition had any connection to the District of Columbia.  *Id.* ¶¶ 31-36. Moreover, *American Skin* was written and filmed in California.  Parker Decl. ¶ 7.

The Moving Defendants do not own or operate the platforms that make *American Skin* available to viewers and had no direct involvement in making the film available to District of Columbia residents through such platforms.  Burg Decl. ¶ 6; Jarowey Decl. ¶ 6; Parker Decl. ¶¶ 6, 9.  Additionally, Plaintiffs' allegation that the Moving Defendants profit substantially from streaming of the film in the District of Columbia is unsubstantiated and speculative.  *See Shaheen*, 994 F. Supp. 2d at 85 (rejecting a similar allegation as a ground for jurisdiction under

---

explained in Section III(B)(2), *infra*, courts routinely reject personal jurisdiction where the only connection with the forum is that content is accessible by forum residents.

the long-arm statute).  Overall, Plaintiffs' allegations regarding the Moving Defendants do not satisfy the "plus factor" that the District's long-arm statute requires, and thus personal jurisdiction under § 13-423(a)(4) is inappropriate.

> ## 2.   Exercise of Personal Jurisdiction Over the Moving Defendants Would Violate Due Process

"Even when the literal terms of the long-arm statute have been satisfied, a plaintiff must still show that the exercise of personal jurisdiction is within the permissible bounds of the Due Process Clause." *GTE New Media*, 199 F.3d at 1347.  For an exercise of jurisdiction to comply with due process, there must be "certain minimum contacts" such that "traditional notions of fair play and substantial justice" are not offended.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (internal quotation marks omitted).  This burden is satisfied if the non-resident defendant "has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotations marks and citation omitted).

This purposeful availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts" or the unilateral activities of a third party.  *Id.* at 475 (internal quotation marks omitted).  On the other hand, "where the defendant deliberately has engaged in significant activities within a State, or has created continuing obligations between himself and residents of the forum," that defendant has sought the "benefits and protections of the forum's laws," and it is therefore "presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.* at 475-476 (internal quotation marks and citation omitted).  Importantly, those significant activities must specifically target users within the forum. *Williams v. Romarm, SA*, 756 F.3d 777, 785 (D.C. Cir. 2014).

The allegation that *Plaintiffs* are based in the District and allegedly suffered injury in the forum is not sufficient. *See Walden v. Fiore*, 571 U.S. 277, 290 (2014) ("Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State. The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."). Plaintiffs failed to show that the Moving Defendants specifically targeted residents of the District of Columbia by writing, producing, and distributing *American Skin*, and thus they have not purposely availed themselves of the benefits and protections of the forum.

Plaintiffs suggest that jurisdiction exists because American Skin "remains available for on-demand viewing and on streaming platforms, including to viewers in the District of Columbia." Compl. ¶ 48. But the film's availability to forum residents is not sufficient to establish jurisdiction because the Moving Defendants do not engage directly in any transactions with forum residents relating to *American Skin*, nor is the film targeted to District of Columbia residents in any manner. Burg Decl. ¶¶ 5-6; Jarowey Decl. ¶¶ 5-7; Parker Decl. ¶¶ 5-9. *See Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 24 (D.D.C. 2017) (explaining that, when it comes to alleged conduct that takes place over the internet, courts have found personal jurisdiction "where the website functions as the defendant's storefront in the forum" or where "the defendant's conduct is aimed at or has an effect in the forum state."), *aff'd*, 2018 WL 4440459 (D.C. Cir. July 17, 2018). Courts have explained that if "mere accessibility" of the defendant's content were sufficient to establish jurisdiction, "personal jurisdiction in Internet-related cases would almost always be found in any forum in the country." *GTE New Media*, 199 F.3d at 1350. Such a rule would conflict with the Due Process Clause's purpose of giving "a

degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Id.* (noting that a contrary rule would "shred these constitutional assurances out of practical existence").

Courts across the country routinely hold that creating a work outside the forum, which is accessible from inside the forum, is insufficient, without more, to satisfy the requirements of due process. *See, e.g.*, *Morningstar Films, LLC v. Nasso*, 2021 WL 4076979, at *5 (E.D.N.Y. Aug. 15, 2021) (no personal jurisdiction over production company that made film streamed on Amazon and Netflix); *Zaletel v. Prisma Labs, Inc.*, 226 F. Supp. 3d 599, 608 (E.D. Va. 2016) (no personal jurisdiction because the defendant's application was indirectly distributed through Apple and Google's application stores, not the defendant's website); *One Media IP Ltd. v. S.A.A.R. SrL*, 122 F. Supp. 3d 705, 718 (M.D. Tenn. 2015) (foreign defendant who distributed music through Amazon and iTunes did not purposely avail itself of privilege of transacting business in forum); *Erickson v. Blake*, 2011 WL 3497798, at *6 (D. Neb. Aug. 10, 2011) (no personal jurisdiction over copyright owner who sold copies of allegedly infringing work via iTunes); *see also Jackson v. Michalski*, 2011 WL 3679143, at *6 (W.D. Va. Aug. 22, 2011) ("Neither the article that he authored nor the website on which the article was published targeted a Virginia audience.").

Plaintiffs fail to allege any facts showing that the Moving Defendants targeted the District or its residents in some way. *Hayes v. FM Broad. Station WETT (FM),* 930 F. Supp. 2d 145 (D.D.C. 2013) is instructive. In that case, the plaintiff alleged that a West Virginia-based radio station infringed his trademark. *Id*. at 147. The radio station operated a website, which District of Columbia residents could access. *Id*. The court reasoned that Plaintiffs failed to

14

show "that the defendants purposefully availed themselves of the District of Columbia any more than they availed themselves of every other jurisdiction in which their website was accessible." *Id*. at 151-152; *see also Brighter Sky Productions v. Marriott Int'l*, 2018 WL 2248601, at *6 (S.D. W.Va. May 16, 2018) ("Rather than specifically target West Virginia residents, the Defendants' website provides the opportunity to buy tickets to shows or make hotel reservations. This opportunity is a generalized offer to anyone in the United States of America or abroad.").

Here, the Moving Defendants did not write or produce *American Skin* in the District of Columbia.  Burg Decl. ¶ 5; Parker Decl. ¶¶ 6-7, 9.  They did not specifically target the District of Columbia in any manner, nor do Plaintiffs' claims arise out of any specific connections to the District.  Burg Decl. ¶¶ 5-6; Jarowey Decl. ¶¶ 5-7; Parker Decl. ¶¶ 5-9.  While District of Columbia residents may access *American Skin* online, everyone else in the county may access the film as well.  Because the Moving Defendants did not deliberately engage in any activities in directed to the District of Columbia, exercising personal jurisdiction over the Moving Defendants would violate due process.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM AS A MATTER OF LAW

To establish a claim for copyright infringement, a plaintiff must prove "ownership of a valid copyright" and "copying of constituent elements of the work that are original."  *Feist Publ'ns v. Rural Tel. Serv.*, 499 U.S. 340, 361 (1991).  Without direct evidence of copying, as here, a plaintiff may "raise the inference of copying by demonstrating both that the alleged infringer had access to the protected work and that the works are substantially similar."  *Gaines v. District of Columbia*, 961 F. Supp. 2d 218, 223 (D.D.C. 2013).  Here, Plaintiffs cannot show access or substantial similarity, let alone both, and thus their claims fail to state a valid claim.

### A.    Plaintiffs Fail to Adequately Plead Access

To show access to an allegedly infringed work, a plaintiff must show that the defendant had a "reasonable opportunity to [view] the plaintiff's work," thereby giving the defendant "the opportunity to copy." *Buchanan v. Sony Music Ent.*, 2020 WL 2735592, at *4 (D.D.C. May 26, 2020) (quoting *Jones v. Blige*, 558 F.3d 485, 491 (6th Cir. 2009)) (granting motion to dismiss copyright claims for failure to adequately plead access), *aff'd*, 836 F. App'x 16 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 465 (2021).  Plaintiffs may establish access either by showing a "particular chain of events" from the plaintiff's work to the creators of the allegedly infringing work, or by establishing that plaintiff's work was "widely disseminated," which "requires a significant showing of ubiquity."  *See Buchanan*, 2020 WL 2735592 at *6.

Importantly, even at the motion-to-dismiss stage, "access may not be inferred through mere speculation or conjecture."  *Id.* at *4.  Instead, a plaintiff must show a "reasonable possibility, not merely a bare possibility, that an alleged infringer had the chance to view the protected work."  *Id.* at *6 (quoting *Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016)); *see also Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (access requires more than a "bare possibility" that defendants viewed the plaintiff's work) (quoting *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988)).  That reasonable opportunity must be supported by "'significant, affirmative and probative' evidence."  *Wager v. Littell*, 2013 WL 1234951, at *3 (S.D.N.Y. Mar. 26, 2013) (dismissing case for failure to adequately plead access), *aff'd*, 549 F. App'x 32 (2d Cir. 2014).  *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (to survive dismissal, plaintiff must allege facts "enough to raise a right to relief above the speculative level").

Courts regularly dismiss complaints in which access is pleaded with no more than speculation and conjecture.  For example, in *Buchanan*, plaintiff's allegations that his lawyer

distributed tapes of his music to a record label that one of the defendants controlled was insufficient to allege access because the plaintiff failed to make any factual allegations regarding his lawyer's relationship with any of the defendants, nor did he specify "*to whom* [his lawyer] provided the demo tape" or "*how* the song was then transferred to the allegedly infringing writers and producers." 2020 WL 2735592, at *7. Similarly, in *Schkeiban v. Cameron*, 2012 WL 12895721, at *1 (C.D. Cal. July 20, 2012), the plaintiff alleged he gave his work to a third party expressly to give to the defendant, and that the third party "'indicated to [plaintiff] that he had given a copy of the work to [defendant].'" The court found that the plaintiff pleaded "no facts showing a chain of events from" the third party to the defendant and further provided "no evidence showing whether their relationship is sufficiently strong to raise a reasonable possibility of access." *Id.* at *2. Instead, the Court held that the plaintiff was "merely speculat[ing] without factual support," and dismissed the complaint for failing to adequately plead access. *Id.* at *1-2.

Plaintiffs make no allegation that *A Routine Stop* was "widely disseminated."[4] Instead, they allege that they submitted *A Routine Stop* to the 2017 TV One Screenplay Competition (the "TV One Competition"), which is "administered and judged in partnership with the American Black Film Festival (ABFF)." Compl. ¶¶ 31, 69-71. Plaintiffs allege three alternate theories of access. Specifically, Plaintiffs allege that defendants Parker or Lee, or *American Skin* actor Omari Hardwick[5] must have been judges of the TV One Competition because they are

---

[4] Nor could they, as Plaintiffs allege *A Routine Stop* was only submitted to the 2017 TV One Screenplay Competition. Compl. ¶ 31. Submission to one competition falls far short of "widespread dissemination." *See, e.g.*, *Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1167 (N.D. Cal. 2014) (entering screenplay in screenwriting competitions and posting drafts online did not constitute evidence of widespread dissemination), *aff'd sub nom. Briggs v. Sony Pictures Ent.*, 714 F. App'x 712 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 233 (2018).

[5] Even if Plaintiffs adequately alleged that Mr. Hardwick obtained their screenplay, which they have not, Plaintiffs have not alleged (and cannot allege) that Mr. Hardwick was involved in writing *American Skin*.

"prominent, influential, and successful members of the African American film and television community" (Compl. ¶ 74(a)), *or* that some unidentified person connected to the TV One Competition or the ABFF gave Plaintiffs' screenplay to one of the defendants or Mr. Hardwick (*id.* ¶ 74(b)), *or* that Parker must have obtained a copy of *A Routine Stop* "through another channel" (*id.* ¶ 74(c)).

These alleged alternate theories are nothing more than speculation and conjecture, and do not adequately allege access. Plaintiffs fail to plead *any* facts in support of *any* of their theories, each alleged in the alternative (because Plaintiffs have no factual support for any of them). As in *Buchanan*, Plaintiffs fail to raise any factual allegations regarding *who* may have provided their competition submission to a defendant or *how* they allegedly did so. *See* 2020 WL 2735592 at *7. Instead, Plaintiffs merely allege that some unidentified person connected to the TV One Competition must have, at some time and in some manner, provided one of the defendants with *A Routine Stop*. This type of fanciful speculation is not remotely sufficient to show access, even at the motion to dismiss stage. *See McKain v. Estate of Rhymer*, 166 F. Supp. 3d 197, 201 (D. Conn. 2015) (Plaintiff's "broad generalizations and possibilities cannot, as a matter of law, establish that the defendants had access to or had any reasonable opportunity of accessing [plaintiff's] work"). Because Plaintiffs fail to adequately allege access, their claims fail regardless of whether the works are substantially similar. *See, e.g.*, *Gaines*, 961 F. Supp. 2d at 223 (both access *and* substantial similarity required for copyright-infringement claim without proof of direct copying).

**B.    *A Routine Stop* and *American Skin* Are Not Substantially Similar**

In addition to access, copyright plaintiffs must demonstrate that the works at issue are substantially similar in their protected expression. *Gaines*, 961 F. Supp. 2d at 223. Once the Court sets aside the works' unprotectable elements, as it must, considering the remaining

protectable elements in *A Routine Stop* and *American Skin* makes clear that the works are not substantially similar as a matter of law.

### 1.    Substantial Similarity May Be Decided on a Motion to Dismiss

"[C]ourts may resolve the question of substantial similarity as a matter of law at the pleadings stage based on a review of the works in their entirety." *Shull v. TBTF Productions*, 2021 WL 3027181, at *2 (2d Cir. July 19, 2021) (citing *Peter F. Gaito Architecture v. Simone Dev. Corp.*, 602 F. 3d 57, 63-65 (2d Cir. 2010)) (affirming Rule 12(b)(6) dismissal of copyright claims for lack of substantial similarity). Courts in this district have explained that where the works at issue lack sufficient similarity to "raise a question of fact," the Court "must dismiss" the claims. *Gaines*, 961 F. Supp. 2d at 223 (considering works at issue and granting motion to dismiss for lack of substantial similarity); *see also Buchanan*, 2020 WL 2735592, at *7-8 (granting motion to dismiss, considering the works at issue and finding no substantial similarity as a matter of law. Courts across the country routinely grant motions to dismiss copyright infringement claims "either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonably jury, properly instructed, could find that the two works are substantially similar." *Gaito*, 602 F.3d at 63.[6] The practice is especially commonplace in the Second Circuit, which this District has recognized is

---

[6] *See, e.g.*, *Abdin v. CBS Broad.*, 971 F. 3d 57, 73 (affirming Rule 12(b)(6) dismissal of copyright claims for lack of substantial similarity); *Lane v. Knowles-Carter*, 2015 WL 6395940, at *4 (S.D.N.Y. Oct. 21, 2015) (granting Rule 12(b)(6) motion to dismiss copyright claims for lack of substantial similarity); *Green v. Harbach*, 2018 WL 3350329, at *1 (S.D.N.Y. July 9, 2018) (same), *aff'd*, 750 F. App'x 57 (2d Cir. 2019); *Hallford v. Fox Entm't Grp., Inc.*, 2013 WL 541370, at *6 (S.D.N.Y. Feb. 13, 2013) (same), *aff'd*, 556 F. App'x 48 (2d Cir. 2014); *Tanksley v. Daniels*, 902 F.3d 165, 175, 177 (3d Cir. 2018) (affirming Rule 12(b)(6) dismissal of copyright claims for lack of substantial similarity); *Heusey v. Emmerich*, 2015 WL 12765115, at *3 (C.D. Cal. Apr. 9, 2015) (granting motion to dismiss copyright claim for lack of substantial similarity), *aff'd*, 692 Fed. Appx. 928 (9th Cir. 2017); *Wild v. NBC Universal*, 788 F. Supp. 2d 1083, 1097 (C.D. Cal. 2011) (same), *aff'd*, 513 Fed. Appx. 640 (9th Cir. 2013).

"by far the most experienced in matters of copyright infringement."  *Nelson v. Grisham*, 942 F.
Supp. 649, 652 n.1 (D.D.C. 1996) ("adopt[ing] the approach of the Second Circuit" to analyze
substantial similarity), *aff'd*, 132 F.3d 1481 (D.C. Cir. 1997).

Where, as here, the works in question are before the Court, "it is entirely appropriate for
the district court to consider the similarity between those works in connection with a motion to
dismiss, because the court has before it all that is necessary in order to make such an evaluation."
*Gaito*, 602 F.3d at 64.[7]  Importantly, "in any case involving substantial similarity, the actual
[works] are the relevant evidence."  *Nelson* , 942 F. Supp. at 652; *see also Walker v. Time Life
Films*, 784 F.2d 44, 51 (2d Cir. 1986) ("[T]he works themselves, not descriptions or impressions
of them, are the real test for claims of infringement.").  Because a determination of substantial
similarity is based on an ordinary observer's comparison of the actual works, discovery is not
necessary.  *Nelson*, 942 F. Supp. at 653 (rejecting expert declaration because "expert testimony is
not relevant … when the question of substantial similarity depends on the observations of the
ordinary reasonable person") (internal quotation marks omitted); *Gaito*, 602 F.3d at 64 (no
discovery necessary because "what is required is only a … comparison of the works"); *Polsby v.
St. Martin's Press, Inc.*, 8 F. App'x 90, 92 (2d Cir. 2001) (discovery "not necessary for a
comparison of the works in order to assess whether, as to the protectible elements, they were
substantially similar").

---

[7] *A Routine Stop* is attached to the complaint as Ex. A.  *See* Dkt. 1-1.  *American Skin* is
incorporated by reference throughout the complaint and forms the basis of Plaintiffs' copyright-
infringement allegations.  *See Nat'l Shopmen Pension Fund v. Disa*, 583 F. Supp. 2d 95, 99
(D.D.C. 2008) ("[W]here a document is referred to in the complaint and is central to the
plaintiff's claim, such a document attached to the motion papers may be considered without
converting the motion into one for summary judgment.").

###### 2.    Courts Must Set Aside Unprotectable Elements

In determining whether two works are substantially similar, courts in this Circuit look to the Second Circuit's "ordinary observer test," which asks whether the "average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Gaines*, 961 F. Supp. 2d at 223 (quoting *Whitehead v. CBS/Viacom*, 315 F. Supp. 2d 1, 8 (D.D.C. 2004)); *see also Williams v. Crichton*, 84 F. 3d 581, 590 (2d Cir. 1996).  When, as here, a work contains both protectable and unprotectable elements, "the Court must ascertain whether 'the *protectible elements, standing alone*, are substantially similar.'"  *Whitehead v. Paramount Pictures*, 53 F. Supp. 2d 38, 47-48 (D.D.C. 1999) (quoting *Williams*, 84 F.3d at 588) (reviewing works at issue and concluding "no reasonable observer could find them substantially similar" beyond their unprotectable ideas), *aff'd*, 2000 WL 33363291 (D.C. Cir. Apr. 19, 2000); *see also Nelson*, 942 F. Supp. at 652 n.1 (courts must "limit [the substantial similarity] inquiry to determine 'whether the protectable elements, standing alone, are substantially similar'") (quoting *Williams*, 84 F.3d at 588); *Scott-Blanton v. Universal City Studios Prods.*, 539 F. Supp. 2d 191, 201 (D.D.C. 2008) ("Before the court can determine whether [the works at issue] are substantially similar, the court must filter out the unprotectible elements."), *aff'd*, 308 F. App'x 452 (D.C. Cir. 2009).

In separating the protectable from the unprotectable, courts repeatedly hold that elements that flow naturally from an unprotectable premise, often termed *scenes a faire*, cannot form the basis of a copyright claim.  These unprotectable elements include "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic," *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980), and "sequences of events that 'necessarily result from the choice of a setting or situation,'" *Nelson*, 942 F. Supp. at 653 (quoting *Williams*, 84 F.3d at 587).  *See also Whitehead*, 53 F. Supp. 2d at

46 ("[S]cenes a faire, and stock themes or settings that often arise in works of a particular genre also are not protected.") (citing *Williams*, 84 F.3d at 587; *Nelson*, 942 F. Supp. at 653). Courts also set aside factual, generic, and common elements. *See, e.g.*, *CBS/Viacom*, 315 F. Supp. 2d at 11 (Marilyn Monroe's biographic "life events," like her marriages and her grandmother's death, were "unprotectable facts"); *Fillmore v. Blumhouse Prods.*, 2017 WL 4708018, at *3 (C.D. Cal. July 7, 2017) ("[d]ream sequences" and "[b]ringing the dead back to life" are unprotectable), *aff'd*, 771 F. App'x 756 (9th Cir. 2019).

For example, in *Nobile v. Watts*, 747 F. App'x 879 (2d Cir. 2018), the Second Circuit affirmed that "the premise of 'a childless couple providentially finding a motherless baby in a boat washed up on an island and deciding to keep the baby' is an unprotectible 'idea.'" *Id.* at 881 (affirming Rule 12(b)(6) dismissal). The Court went on to affirm that the remaining similarities, including for example "finding and illicitly concealing the dead adult accompanying the baby," were unprotectable *scenes a faire* that flowed naturally from the unprotectable idea. *Id.* And in *Walker v. Time Life Films*, the Second Circuit affirmed summary judgment in favor of defendants where both works about Bronx police included "[e]lements such as drunks, prostitutes, vermin and derelict cars," "[f]oot chases," "the morale problems of policemen," and "the Irish cop," holding those concepts to be unprotectable stock themes and *scenes a faire*. 784 F.2d at 50. "As such, they are not copyrightable except to the extent they are given unique – and therefore protectible – expression in an original creation." *Id.*

In *Benay v. Warner Bros.*, 607 F.3d 620 (9th Cir. 2010), the plaintiffs pointed to a litany of purported similarities between their work and the movie *The Last Samurai*:

> Both have identical titles; both share the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the methods of modern Western warfare for its fight against a samurai uprising; both have protagonists who are authors of non-fiction studies on war and who have flashbacks to battles in

> America; both include meetings with the Emperor and numerous battle scenes; both are reverential toward Japanese culture; [] both feature the leader of the samurai rebellion as an important foil to the protagonist[; and] in both works the American protagonist is spiritually transformed by his experience in Japan.

*Id.* at 625.  Upon analyzing the works for itself, the Ninth Circuit disregarded these similarities as flowing from the works' shared "basic plot premise" of "an American war veteran [who] travels to Japan in the 1870s to train the Imperial Army in modern Western warfare."  *Id.*  The Court ultimately held that, "[s]tripped of these unprotected elements, the works are not sufficiently similar" to support a copyright-infringement claim.  *Id.*[8]

### 3.    The Works' Protectable Expression Is Not Substantially Similar

"[A] determination of substantial similarity requires a detailed examination of the works themselves."  *Williams*, 84 F.3d at 583 (internal quotation marks omitted).  Looking at *only* the protectable elements in the works at issue, as courts must, the question becomes the extent to which the works share "particular expression through similarities of treatment, details, scenes, events and characterization."  *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976); *see also Williams*, 84 F.3d at 588 (examining "similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting").  In this case, the works' protectable expression, standing alone, is not substantially similar.

---

[8] *See also Abdin*, 971 F. 3d at 68 (concept of extending microorganism's ability to survive in space into ability to travel in space, supernatural forces, war games, and alien discovery were all unprotectable ideas and stock themes); *Sheldon Abend Revocable Tr. v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010) (no substantial similarity between short story *Rear Window* and movie *Disturbia* where "both works [told] the story of a male protagonist, confined to his home, who spies on neighbors to stave off boredom … discovers that one of his neighbors is a murderer … is himself discovered by the suspected murderer, is attacked by the murderer, and is ultimately vindicated.").

### a.    Plot and Sequence

Most of the alleged similarities between the works' plots are unprotectable concepts, *scenes a faire*, and generic elements in film and television.  When those unprotectable elements are set aside, as they must be, the works' plots are not substantially similar.

*First*, there can be no question that the idea of a police officer shooting and killing an unarmed man during a traffic stop, and then facing no criminal repercussion, is based in reality. *See* Compl. ¶¶ 5, 53.[9]  There also can be no question that combating systemic racism in our justice system and curtailing police violence, particularly against people of color, has come to the forefront of the cultural conversation over the last few years.[10]  This factual premise is unprotectable.  *See CBS/Viacom*, 315 F. Supp. 2d at 11 (setting aside elements based on "unprotectable facts").

*Second*, it follows naturally that a man who watched an officer walk away from killing the man's loved one without facing charges would "feel[] betrayed by the justice system," and "decide[] to take matters into his own hands."  Compl. ¶¶ 54, 56.  Moreover, this idea of vigilante justice is generic and far from original, instead found in countless works – for example, the 2009 film *Law Abiding Citizen*, in which "[a] frustrated man decides to take justice into his own hands after a plea bargain sets one of his family's killers free," and the 2009 film *Harry Brown*, in which "[a]n elderly ex-serviceman and widower looks to avenge his best friend's

---

[9] *See, e.g.*, David D. Kirkpatrick et al., *Why Many Police Traffic Stops Turn Deadly*, N.Y. TIMES (Oct. 31, 2021), https://www.nytimes.com/2021/10/31/us/police-traffic-stops-killings.html (finding that in more than 400 killings of unarmed drivers, charges were brought against only 32 officers, with only five convicted).

[10] *See, e.g.,* Larry Buchanan et al., *Black Lives Matter Puts Another Stamp on History*, N.Y. TIMES (July 8, 2020), https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html ("15 million to 26 million people in the United States have participated in demonstrations over the death of George Floyd and others in recent weeks").

murder by doling out his own form of justice" – not to mention most superhero movies, from *Batman* to *Spider-Man* to *Watchmen*.[11]

*Third*, it flows naturally that a man disheartened by an unjust criminal justice system would consider "get[ting] street justice" by putting the officer through his own version of a trial. Compl. ¶¶ 54, 56.  Indeed, Plaintiffs' own complaint succinctly summarizes this unprotectable premise, clearly rooted in the creators' desire to probe the justice system's treatment of systemic racism: "an ordinary man, feeling betrayed by the system that is supposed to protect him and his loved ones, takes it upon himself to right the wrong committed on his [loved one] by exposing the failure of the system itself."  *Id.* ¶ 40.  This is an unprotectable "basic plot premise," which flows naturally from the unprotectable idea of a police officer escaping criminal charges for killing an unarmed man during a traffic stop.  *See Benay*, 607 F.3d at 625 ("basic plot premise" of "an American war veteran [who] travels to Japan in the 1870s to train the Imperial Army in modern Western warfare" was unprotectable); *Nobile*, 747 F. App'x at 881 ("[T]he premise of 'a childless couple providentially finding a motherless baby in a boat washed up on an island and deciding to keep the baby' is an unprotectible 'idea.'"); *Abend*, 748 F. Supp. 2d at 208 ("broad plot idea, or premise" of "male protagonist, confined to his home, who spies on neighbors to stave off boredom and, in so doing, discovers that one of his neighbors is a murderer" and is then

---

[11] *See Law Abiding Citizen* (2009), https://www.imdb.com/title/tt1197624/; *Harry Brown* (2009), https://www.imdb.com/title/tt1289406/; *Batman Begins* (2005), https://www.imdb.com/title/tt0372784/;  *Spider-Man* (2002), https://www.imdb.com/title/tt0145487/; *Watchmen* (2009), https://www.imdb.com/title/tt0409459/; *see also Abducted* (2020), https://www.sho.com/titles/3478671/abducted ("When his daughter is kidnapped and the police come up empty, Dane decides to take matters into his own hands").  Plaintiffs' suggestion that the works' "loglines … are substantially similar" because they both include the phrase "into his own hands" is farcical given the ubiquity of the phrase.  *See* Compl. ¶¶ 50-52.

"himself discovered by the suspected murderer, is attacked by the murderer, and is ultimately vindicated" was "not a protectible element").[12]

Other alleged similarities flow from these unprotected premises.  It makes sense that the cleared officer would not willingly submit to an unauthorized trial and would "express[] that the main character has no authority to charge him."  Compl. ¶¶ 55, 59.  Given that the officer was kidnapped and held hostage, it is unsurprising that the kidnapper would be "armed with a handgun."  *Id.* ¶ 60.  Given the unprotectable premise of the "trial," it makes sense that the character most devastated by the cop's actions would present the prosecution's case.  *Id.* ¶ 57.  And it flows naturally that the cop's guilty sentence would satisfy the main character's need for justice – not revenge – such that he would choose not to kill the cop after the trial.  *Id.* ¶¶ 62-63.  If revenge were the character's goal, he would not go through the effort of a "trial," and instead would simply exact his revenge.

Once these unprotectable premises and elements are disregarded, the plots of the works are quite different:

- In *A Routine Stop*, twin brothers in their late twenties are stopped coming home from a wedding, and one is killed after an officer says he thought the unarmed man was pulling out a gun.  Compl. Ex. A at 4, 40, 65.  In contrast, in *American Skin*, a single father and his 14-year-

---

[12] Moreover, the concept of an aggrieved party taking a person hostage and conducting an unsanctioned "trial" for the alleged transgression is far from novel.  For example, in the 2012 Batman film *The Dark Knight Rises*, the villain's loyal followers take hostages – including the police commissioner – and, in a "court" sentencing hearing with "no lawyer, no due process," their leader hands down sentences.  *See The Dark Knight Rises* (2012), https://www.imdb.com/title/tt1345836/plotsummary; *see also* https://www.youtube.com/watch?v=i-dJPoSlPfU.  And in a 2011 episode of *General Hospital*, for example, a character takes four people hostage and asserts "charges" against each of them; she threatens to shoot them if they do not cooperate in the "trial."  *See General Hospital* (2011), https://www.imdb.com/title/tt1970768/?ref_=kw_li_tt; *see also* https://www.youtube.com/watch?v=beG0JwixUtQ.

old son are stopped by police in an affluent neighborhood; the son is shot after refusing to stop filming police with his cell phone.  Ex. 1 at 2:10.

- In *A Routine Stop*, the audience does not see the officer's kidnapping, carried out by Romulus's friends Pooh Bear and Duck.  Moreover, the kidnapping and trial involves a small group of people: three operatives, a couple witnesses, the two jury members (the officer's family), and the officer himself.  Romulus's friends act as the judge (Pooh Bear) and the bailiff (Duck).  Officer Tully is forced to act as his own defense counsel.  Compl. Ex. A at 5-9, 14-17, 23-26, 64-70, 76.  In *American Skin*, on the other hand, Lincoln handles the kidnapping himself and forces the documentary students to become unwilling participants.  The ultimate trial is a huge operation conducted through a complete takeover of a police precinct by Lincoln and many veteran operatives.  There is no judge.  Instead, Lincoln appoints another officer to act as Officer Randall's defense counsel, and police officers, civilians, inmates, and the student documentary crew all are forced to participate and debate the merits of the officer's case – as well as themes including race, classism, patriotism, slavery, and the role of police in society.  Ex. 1 at 43:05.

- In *A Routine Stop*, Romulus somehow broadcasts the trial live to the police station from a recording studio, setting off the major plot line of Tully's fellow cops searching all possible ways to find the studio and end the trial and broadcast.  Tully is rescued after Romulus's mother tells the cops the studio's location, in exchange for an hour's worth of time for the trial to continue.  Compl. Ex. A at 61, 63, 75.  In contrast, the officers in *American Skin* are not looking for Randall – they know precisely where he is, as Lincoln and his veteran friends take over the precinct and take the cops and other civilians in the building hostage.  And the trial is not broadcast; instead, student documentarians film the proceedings.  Ex. 1 at 35:35.

- In *A Routine Stop*, Officer Tully does not ultimately appear remorseful for his actions, instead remaining defensive – and after Romulus's trial captures the police department's attention, some measure of justice is achieved: Tully is fired and indicted for second-degree murder and obstruction of justice (and the prosecutor who coached his grand jury testimony is disbarred and indicted for witness tampering and obstruction of justice).  Compl. Ex. A at 79, 82.  In addition, the audience learns that Remus was murdered instead of Romulus, leaving Romulus to lead a new life under Remus's name, free from Romulus's criminal record.  *Id.* at 83, 85.  In contrast, in *American Skin*, Officer Randall ultimately appears genuinely remorseful for his actions, apologizing and attempting to help Lincoln leave the precinct unharmed.  Ex. 1 at 1:21:12.  Instead, Lincoln is shot by a sniper and the cop is never formally charged – even at the end, there is no justice.  *Id.* at 1:22:38.

### b.      Themes

"A work's theme is its overarching message," and "there is no protection for stock themes or themes that flow necessarily from a basic premise."  *Silas v. Home Box Office*, 201 F. Supp. 3d 1158, 1180 (C.D. Cal. 2016), *aff'd*, 713 F. App'x 626 (9th Cir. 2018).  Plaintiffs emphasize that both works "focus[] on police violence against Black men and women and the country's systemic indifference to it."  Compl. ¶¶ 2 (*A Routine Stop*), 4 (*American Skin*).  As described above, this is based in reality and unprotectable.  *See* Section IV.B.3(a), *supra*.

Moreover, this theme is explored differently in each work.  In *A Routine Stop*, justice is delivered to Remus's family, as the cop who killed Remus is fired and indicted for murder, the district attorney who helped derail the initial indictment likewise is indicted, and all kidnapping charges against Romulus are dropped.  Compl. Ex. A at 79, 81-82.  Moreover, the screenplay ends with hope and optimism, as Romulus is given a second chance.

The takeaway from *American Skin* is much bleaker: there seems to be no hope for justice, as Lincoln is killed in retaliation for the precinct takeover and the media suggests the trial was no more than a product of Lincoln's mental instability and unsubstantiated "connections to Islamic extremists." Ex. 1 at 1:23:24. The film closes with the 24-hour news cycle pivoting from explaining away a Black military veteran and father's plea for justice to blandly discussing sports, the world having learned no lessons. *Id*. at 1:23:44.

In addition, the complaint fails to mention *American Skin*'s central theme of a father-son relationship and the sacrifices a father will make to protect his son, as Lincoln first abandons his career to prioritize his son's education and ultimately sacrifices his life to seek justice for his son. *See* Ex. 1 at 7:00, 15:30, 1:22:36. The film further explores the difficult transition veterans make when rejoining civilian life after their military discharge. *See* Ex. 1 at 6:42, 15:24, 17:25. *A Routine Stop* does not explore these themes.

### c.  Characters

Plaintiffs' complaint alleges superficial similarities between a handful of characters across the dozens of different characters in each work. To start, Plaintiffs allege that the main characters in *A Routine Stop* (Romulus) and *American Skin* (Lincoln) each is "described … as unshaven, intelligent, African American men, who have strong viewpoints on justice" and who feel "helpless and betrayed by the criminal justice system." Compl. ¶ 64. But "[t]hese shared abstract and general character traits do not make the two characters similar for purposes of copyright analysis." *Whitehead*, 53 F. Supp. 2d at 48 ("Race, intelligence, aggressiveness, paranoia," "athleticism," working for the CIA, dating a white woman, holding a bachelor's degree in political science, and taking a personality test were "not copyrightable" and did not support substantial similarity); *see also Tanksley*, 902 F.3d at 175, 177 (affirming dismissal of copyright action against defendant's television series *Empire* where both works include African-

29

American, male record executives diagnosed with incurable diseases).  Beyond these generic

similarities, Romulus and Lincoln are quite different.  Romulus is a single man in his late

twenties who the officer describes as "a criminal with a rap sheet longer than a roll of toilet

tissue."  Compl. Ex. A at 24.  Lincoln is a military veteran who, upon discharge, took a job as a

janitor in a wealthy private school so that his teenage son could attend the school.  Ex. 1 at 7:00,

15:30.  Romulus is a young man just starting his life after making bad choices in his past;

Lincoln has chosen to sacrifice his career to ensure his son's future – a future stolen from them

both by Officer Randall.

        Reviewing the actual works at issue further dispels Plaintiffs' allegations of similarities

between the works' characters:

- The complaint ignores the significant differences between the police officers in each of

the works.  In *A Routine Stop*, even after going through the trial and seeing the damage caused by

Remus's death, Officer Tully does not express remorse; shortly after admitting that he should not

have killed Remus, Tully laughs as law enforcement surrounds the building, and proclaims that

he will "be home in time for SportsCenter."  Compl. Ex. A at 71.  By the end of the film, Tully is

indicted for second degree murder and obstruction of justice and is fired.  Compl. Ex. A at 79,

82.  In *American Skin*, on the other hand, Officer Randall listens to the impact his actions had on

Lincoln and considers the larger implication of racial profiling.  Randall apologizes for his

actions and ultimately tries to protect Lincoln's life.  Ex. 1 at 1:21:26.[13]

---

[13] The complaint also alleges that the shooting officer in each work has "a wife and a young son."  Compl. ¶ 58.  Even if accurate, the similarity is at best the same type of "general character trait" that is unprotectable under copyright law.  *See Whitehead*, 53 F. Supp. 2d at 48. The complaint further alleges that both officers attempt to justify the shooting in part by explaining they were "just trying to make it home," but this is a natural response of a police officer accused of killing someone in the line of duty.  Compl. ¶ 61.

- The complaint alleges that a "police captain" in each work "tries to end the standoff and trial without violence." Compl. ¶ 65. While a police captain attempting to end a hostage situation without violence is hardly novel or protectable, the characters and scenes unfold differently in each work: in *A Routine Stop*, the police captain spends nearly the entire film searching for Romulus's location to end the standoff, ultimately resolving the situation without violence, dropping the charges against Romulus and instead holding Officer Tully and the district attorney accountable for their actions (Compl. Ex. A at 12, 19, 37, 45, 79, 81-82); in *American Skin*, the captain himself is a hostage who participates in the trial and does not stop SWAT from shooting Lincoln at the end (Ex. 1 at 27:26, 29:35, 1:22:36).

- The complaint alleges that in both works, "the mother of the deceased victim is a supporting character." Compl. ¶ 66. Of course she is. But the mothers take on different roles in each work. In *A Routine Stop*, Remus's mid-60s mother testifies as a character witness in Romulus's staged trial, and ultimately reveals the trial's location to police and pleas with the sergeant not to "let them kill [her] baby." Compl. Ex. A at 27, 63. In *American Skin*, while Kajani's mother – separated from Lincoln – copes with her devastation over her son's death and the lack of grand jury indictment, officers ask her to give a public statement admonishing protesters to stop the violence. Ex. 1 at 24:20. Kajani's mother takes no part in Lincoln's trial.

- Plaintiffs' allegation that two characters' names – Carter "Duck" Duckworth and Omar "Derwood" Scott, Compl. ¶ 67 – are similar is plainly incorrect. "Duck" and "Derwood" clearly are different names. Plaintiffs further claim these characters are similar because they are "portrayed as rough and with nothing to lose." *Id.* It is no surprise that a man willing to help his friend take a police officer hostage would be "portrayed as rough and with nothing to lose" (*id.*), and moreover, those characteristics are too generic to be protectable. But even that

characterization is a stretch.  While Duck, in *A Routine Stop*, may be "portrayed as rough," he is *not* portrayed as having nothing to lose – on the contrary, Duck expresses that he is committed to the kidnapping in spite of the consequences because of his bond to Remus.  *See* Compl. Ex. A at 5-6.  On the other hand, Lincoln's friend Derwood in *American Skin* is a former marine dying of cancer after choosing to stop chemotherapy; he truly has "nothing to lose."  Ex. 1 at 17:30.

- Plaintiffs further allege that both works include "a prosecutor who does not indict the police officer who was charged."  Compl. ¶ 68.[14]  A prosecutor's failure to fully prosecute police flows naturally from the works' unprotected premise of a man disheartened with the criminal justice system's response to injustice.  Moreover, the prosecutor in *A Routine Stop* is a fully formed character, appearing as a witness in the trial and ultimately indicted for obstruction of justice and witness tampering.  Compl. Ex. A at 51, 81.  There is no equivalent character in *American Skin*.

In addition to overstating the similarities between certain characters, Plaintiffs ignore meaningful differences between other characters in the works.  For example, in *A Routine Stop*, we know little about Remus other than that he was a loving son and brother, an upstanding citizen, and that he was flirtatious.  Compl. Ex. A at 1-2, 18, 30, 45.  In contrast, *American Skin* weaves together home videos and other "archival" content to paint a vivid picture of Kajani as an arty, intellectual teenager who questions everything and is eager to take on the world.  *See* Ex. 1 at 8:25, 11:58.  The complaint also fails to describe the student documentarians in *American Skin* – key figures who drive the plot, in particular the director who becomes the twelfth juror and guides the split jury to a guilty verdict.  Ex. 1 at 2:55, 1:10:30.

---

[14] This allegation misrepresents the process of charging a person with a crime.  A grand jury decides whether to indict or not; a prosecutor presents the case to the grand jury.

**d.      Settings**

*A Routine Stop* begins at a lavish wedding and ends on a street corner, but the bulk of the screenplay takes place in a nondescript recording studio and the police station.  Compl. Ex. A at 1-2, 5, 9-10, 84-85.  The recording studio is integral to the mechanics of Romulus broadcasting the trial to the police station – he uses soundproof features when he needs to sidebar with Duck and Pooh Bear out of earshot, and keeps his "jury" in a separate room from the officer, such that Tully cannot hear any goings on in the jury room (key to Tully's delayed discovery that his wife and son are the only jury members).  *Id.* at 17, 22, 37.

On the other hand, the student filmmakers in *American Skin* cover much ground, following Lincoln and his family around Los Angeles to their various homes, the high school Kajani attended, and other locations – crucially including the police captain's house, at which point the documentarians become unwilling accomplices.  Lincoln ultimately takes over the entire police precinct (not a recording studio) to conduct Randall's trial.  Ex. 1 at 29:02.

**e.      Pace**

*A Routine Stop* gives the audience a look into three moments in time: the night Remus is killed on his way home from the wedding; the hours-long trial Romulus mounts; and a memorial celebration held on the one-year anniversary of Remus's death.  Compl. Ex. A at 1, 5-9, 12-18, 23-27, 29-43, 49-58, 64-73, 80.  In contrast, the student documentary team in *American Skin* appears to follow Lincoln's family over a period of only a few days – from the announcement of the grand jury's decision through Lincoln's precinct takeover shortly after, at the conclusion of which Lincoln is killed.  Ex. 1 at 2:55, 1:22:55.

**f.      Total Concept and Feel**

The total concept and feel of a work refers to the way the author selected, coordinated, and arranged the elements of the work, taking into consideration similarities in "mood, details or

characterization." *Reyher*, 533 F.2d at 91-92.  In comparing the total concept and feel of the works, courts consider the works as a whole.  *See Jones v. CBS*, 733 F. Supp. 748, 754 (S.D.N.Y. 1990).  Here, the total concept and feel of the works differ sharply.  *A Routine Stop* is presented in a linear format typical of narrative films, largely chronological with only one flashback to reveal the film's twist ending – that Remus, not Romulus, was killed – and includes an epilogue one year later.  *See* Compl. Ex. A at 83.  On the other hand, from the start, *American Skin* is presented as a film graduate student's thesis – as if the filmmaker character created a documentary utilizing the main characters' bodycam footage, home videos, and news footage. *See, e.g.* Ex. 1 at 0:41, 8:25, 19:35.

As discussed above, while certainly somber to start, *A Routine Stop* ultimately conveys a message of hope – the epilogue reveals that those involved in killing Remus have been brought to justice, and Romulus is free to live a new life without his criminal record.  And the screenplay incorporates moments of levity throughout, usually through Romulus's partners Pooh Bear and Duck.  Compl. Ex. A at 14, 16.  *American Skin*, on the other hand, is somber from start to finish, approaching the subject matter in a more academic way.  Through the trial and jury debate, the filmmakers take the audience through a range of discussions about slavery (Ex. 1 at 51:35), class (*id.* at 57:10), institutional racism (*id.* at 52:43), patriotism (*id.* at 1:11:53), the music industry (*id.* at 54:30), and police education (*id.* at 48:10).

Overall, once the premise of the works and the *scenes a faire* that flow from that premise and commonplace elements are disregarded, the works' protectable elements, standing alone, are not substantially similar as a matter of law.

### C.     Plaintiffs' Contributory and Vicarious Infringement Claims Likewise Fail

Because Plaintiffs fail to plausibly allege a claim of direct copyright infringement, their claims for contributory and vicarious copyright infringement must also be dismissed.  *See*

*Newborn v. Yahoo!*, 391 F. Supp. 2d 181, 186 (D.D.C. 2005) ("[T]o establish a claim of

contributory copyright infringement, a plaintiff must first demonstrate that the plaintiff's

copyrights have been directly infringed by a third party."); *Williams v. A & E Television*

*Networks*, 122 F. Supp. 3d 157, 165 (S.D.N.Y. 2015) ("'[T]here can be no contributory

infringement absent actual infringement…,' and no vicarious infringement absent direct

infringement.") (citing *Faulkner v. Nat'l Geographic Enters.*, 409 F. 3d 26, 40 (2d Cir. 2005)).

## V.     CONCLUSION

For the reasons explained above, the Moving Defendants respectfully request that the

Court dismiss this lawsuit and, because an amendment cannot cure the defects in Plaintiffs'

claims, the dismissal be with prejudice.

DATED: December 17, 2021                    Respectfully submitted,

/s/ *Nicolas A. Jampol*
Nicolas A. Jampol (*pro hac vice*)
Cydney Swofford Freeman (*pro hac vice*)
Samantha Lachman (*pro hac vice*)
Davis Wright Tremaine LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, CA 90017
Tel: (213) 633-8651
nicolasjampol@dwt.com
cydneyfreeman@dwt.com
samlachman@dwt.com

Alison Schary (Bar No. 1014050)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500
Washington, DC  20005
Tel: (202) 973-4248
alisonschary@dwt.com

*Counsel for Nathaniel Parker, Tiny Giant*
*Productions, LLC, ASP Film, LLC, TM Film*
*Finance, LLC, and Vertical Entertainment, LLC*